1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

CELLCO PARTNERSHIP,                     )   No. CV 15-1187-DSF (PLA)
                                        )
                    Plaintiff,          )
                                        )
            v.                          )   **ORDER CONDITIONALLY GRANTING**
                                        )   **PLAINTIFF'S EX PARTE APPLICATION**
                                        )   **FOR A TEMPORARY PROTECTIVE**
TORO RIDE, INC., et al.,                )   **ORDER**
                                        )
                    Defendants.         )
_____)

      Plaintiff Cellco Partnership, d/b/a Verizon Wireless ("Verizon Wireless" or "plaintiff"), filed this action on February 18, 2015, alleging fraud and breach of contract against defendants Toro Ride, Inc. and its president and CEO, Karen Kevin Galstian ("Galstian") (collectively "Toro Ride"), under an agreement signed on February 4, 2014, relating to Toro Ride's acquisition of iPhones for its Los Angeles-area rideshare service.  On February 19, 2015, plaintiff filed an ex parte application for a writ of attachment and right to attach order, or in the alternative a temporary protective order ("TPO").  This case is assigned to the Honorable Dale S. Fischer, United States District Judge.

# I.

## <u>BACKGROUND</u>

Toro Ride was formed on July 26, 2013, and purports to provide a rideshare service to individuals in the Los Angeles area. (Compl. ¶ 8). Defendant Galstian purports to be the Chief Executive Officer and/or President of defendant Toro Ride, Inc. (<u>Id.</u> ¶ 9). According to plaintiff, Galstian is also a criminal defendant in <u>United States v. Galstian, et al.</u>, in the United States District Court for the Southern District of California, in case number 13-CR-3481. (<u>Id.</u> ¶ 10). The indictment in that matter charged Galstian, along with seventeen other defendants, with conspiracy to commit bank fraud (18 U.S.C. § 1349), and aggravated identity theft (<u>id.</u> § 1028A). (<u>Id.</u>) On January 16, 2014, Galstian pleaded guilty to the conspiracy charge and, according to the docket in that case, is awaiting sentencing on March 30, 2015. (<u>Id.</u>).

On February 14, 2014, unaware of Galstian's criminal history, Verizon Wireless entered into a "Verizon Wireless National/Major Account Agreement" ("Agreement") with Toro Ride, Inc. (Compl. ¶ 13, Ex. A; Dkt. No. 14 at 4). Pursuant to the Agreement, Toro Ride has acquired over thirty-four thousand iPhones from Verizon Wireless. (Compl. ¶ 13, Ex. A). The Agreement provides that Toro Ride would use the iPhones exclusively for its ridesharing business. (<u>Id.</u> ¶¶ 14, 27). Specifically, the agreement provides that Toro Ride would "purchase wireless service and equipment at discounted prices *for its employees' business use* and machine-to-machine data service *for its own business use*" and would not resell the equipment or service to third parties. (<u>Id.</u> ¶ 27, Ex. A at 1 (emphasis added)). The agreement also provided: "Except upon written agreement between the Parties, third parties (including agents, contractors or contract employees, and members or franchisees of Customer or of Customer's qualifying parents and affiliates) may not purchase Wireless Service or Equipment under this Agreement nor may Customer resell the Wireless Service or use M2M Lines bundled with or embedded into products or services that it sells to its customers." (<u>Id.</u> ¶¶ 27, 37, Ex. A at ¶ 10). Verizon Wireless subsidized each iPhone acquired by Toro Ride, so that Toro Ride's cost to acquire the iPhones was close to or equal to $0. (<u>Id.</u> ¶ 16). In exchange, Toro Ride promised to maintain and pay for Verizon Wireless service on each iPhone for at least two years. (<u>Id.</u> ¶ 17).

Between February and September 2014, Toro Ride ordered an average of less than 100 iPhones per month. (Id. ¶ 20). Between October and December 2014, the average increased to nearly 5,000 iPhones per month. (Id.). At an October 3, 2014, face-to-face meeting between three Verizon Wireless employees responsible for the Toro Ride account -- Ashley Stanton (Director of Business Sales), Cynthia Bell (Associate Director of Business Sales), and Talin Isagholi (Business Sales Manager) -- and Galstian, Galstian represented that Toro Ride had a business plan for the deployment of the iPhones in a number of cities throughout California, as part of a state-wide "launch" planned for the end of the year. (Id. ¶ 27). Galstian also represented that Toro Ride would require an additional 7,000 to 10,000 iPhones by the end of the year. (Id.). At a November 20, 2014, face-to-face meeting between Verizon Wireless employees Bell, Isagholi, Luis Cruz (Southern California Regional President), and Pete Antonic (Acting Director of Business Sales), and Galstian, Galstian represented that he had been working with the California Governor's office to offer free rides to passengers on New Year's Eve as part of Toro Ride's statewide launch, and claimed to be planning a nationwide launch within the next three months. (Id.). He stated Toro Ride would require even more iPhones from Verizon Wireless in order to meet these purported business plans. (Id.). In January 2015, Toro Ride increased its orders to over 16,000 iPhones. (Id. ¶ 20). In February 2015, Toro Ride asked to increase its orders again, claiming to need 25,000 iPhones in February and another 50,000 in March 2015. (Id. ¶ 21).

Tamara Flowers, who became the new Director of Business Sales for Southern California in January 2015, became concerned about the volume of iPhones ordered by Toro Ride and set up a meeting to review the business and evaluate Verizon Wireless' risk in selling so many iPhones to Toro Ride. (Declaration of Tamara Flowers ("Flowers Decl.") ¶¶ 14, 15, filed concurrently with Dkt. No. 12 (Ex Parte Application for Right to Attach Order and Order for Issuance of Writ of Attachment)). On February 4, 2015, Flowers and other Verizon Wireless employees met with Galstian. (Id. ¶ 16). Flowers asked Galstian where his business was going and Galstian acknowledged that only 600-700 of the iPhones were presently in use with Toro Ride drivers, but claimed that he needed all the iPhones he had ordered, as well as 25,000 in February,

and 50,000 more in March, for a nationwide launch scheduled in March 2015.  (Id. ¶¶ 17-18).
Flowers asked Galstian if he had been re-selling the iPhones, which Galstian denied.  (Id. ¶ 20).
Flowers advised Galstian that Verizon Wireless would reinstate the $200 deposit for Toro Ride's
January 2015 orders, and if he did not want to pay the $200 deposit, he needed to return the
iPhones purchased in January and February 2015.  (Id. ¶ 21).  Flowers also requested a schedule
showing how Toro Ride had deployed its previously-purchased iPhones and how it intended to
deploy them in the future.  (Id.).  Galstian made no promise to pay the deposits or provide the
deployment information, and refused to return the phones, despite several further telephone
conversations that day.  (Id. ¶ 22).  In a subsequent email exchange with Flowers, Galstian again
represented that Toro Ride required the iPhones for its launch in other markets, and threatened
to move his service to another carrier.  (Id. Ex. B).

On February 8, 2015, and again on February 11, 2015, Verizon Wireless sent Toro Ride
a written demand for a $3.3 million deposit, calculated as $200 for each iPhone acquired by Toro
Ride in January 2015.  (Compl. ¶ 42, Ex. B at 27-28; Flowers Decl. Ex. C).  The deposit was due
on February 15, 2015.  (Compl. ¶ 43, Ex. B at 28).  Toro Ride failed to pay this deposit as
requested by Verizon Wireless, and did not return the iPhones.  (Id. ¶ 44; Flowers Decl. ¶ 25).  In
February 2015, after having shipped more than 34,000 iPhones to Toro Ride, Verizon Wireless
ceased sales to Toro Ride.  (Compl. ¶ 22).

Shortly after the February 4, 2015, meeting with Galstian, Verizon Wireless began to
carefully review activity on the iPhones it had sold to Toro Ride.  (Flowers Decl. ¶ 26).  The
investigation revealed that more than 98% of the more than 34,000 phones order by Toro Ride
showed no use on the Verizon Wireless network.  (Id.).  The investigation also revealed that over
11,000 of the iPhones had been turned on and activated in foreign countries, including Vietnam,
China, Saudi Arabia, and Iraq, among others.  (Id. ¶ 27-28).

On February 20, 2015, Verizon Wireless filed an "Omnibus Memorandum of Points and
Authorities in Support of Ex Parte Applications" (Dkt. No. 14) for various orders, including an
application for a writ of attachment, seeking to attach a Bank of America Account, a City National
Bank Account,  as well as investment accounts, checking accounts, savings accounts, certificates

of deposit, and safe deposit boxes held by, or under the signature or Toro Ride, Inc., at both financial institutions. (Dkt. No. 12 at 2, Attach. 1, 2). The amount to be secured by the attachment is $3.3 million. (Dkt. No. 12. Attach. 4). Alternatively, Verizon Wireless requests a TPO. (Dkt. Nos. 12 Attach. 8, 14 at 22). Verizon Wireless also requests that the notice requirement for the ex parte application for writ of attachment be waived. (Dkt. Nos 12 at 3, 14 at 23).

The magistrate judge has carefully considered all documents filed in support of the ex parte application and the files and records of this case, and rules as follows:

## II.

## ENTITLEMENT TO RELIEF

**A.   LEGAL REQUIREMENTS FOR ISSUANCE OF EX PARTE WRIT OF ATTACHMENT AND TPO**

Rule 64 of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. . . .

In order to obtain an ex parte writ of attachment under California law, the party seeking the attachment has the burden of proving:

(1)   The claim upon which the attachment is based is one upon which an attachment may be issued.

(2)   The plaintiff has established the probable validity of the claim upon which the attachment is based.

(3)   The attachment is not sought for a purpose other than the recovery upon the claim upon which the attachment is based.

(4)   The affidavit accompanying the application shows that the property sought to be attached, or the portion thereof to be specified in the writ, is not exempt from attachment.

(5)   The plaintiff will suffer great or irreparable injury (within the meaning of Section 485.010) if issuance of the order is delayed until the matter can be heard on notice.

(6)   The amount to be secured by the attachment is greater than zero.

Cal. Civ. Proc. Code § 485.220(a).  Section 485.010(b) provides that the element that "great or irreparable injury would result to the plaintiff if issuance of the order is delayed until the matter could be heard on notice" is satisfied if, among other things, the plaintiff shows that:

> Under the circumstances of the case, it may be inferred that there is a danger that the property sought to be attached would be concealed, substantially impaired in value, or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice.

Id. § 485.010(b)(1); see Connecticut v. Doehr, 501 U.S. 1, 16, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991) (holding prejudgment seizure without notice permissible only upon showing of exigent circumstances).

> **1.      The Claim Is One Upon Which an Attachment May Be Issued and the Attachment Is Not Sought for a Purpose Other Than the Recovery Upon the Claim Upon Which the Attachment Is Based**

To be subject to attachment under the first prong of Civil Procedure Code section 485.220(a), a claim must meet the following requirements:  (1) it must be one for money "which is based upon a contract, express or implied;" (2) the total amount must be a "fixed or readily ascertainable amount not less than five hundred dollars;" (3) the claim must not be secured by any interest in real property; and (4) the claim must be a commercial one.  Cal. Civ. Proc. Code § 483.010(a)-(c).

The Court finds that Verizon Wireless meets the requirements for finding that the property is subject to attachment.  See id. §§ 487.010(a), (c)(1)-(10).  First, the breach of contract claim is based on the written Agreement with specified terms signed by both parties and, therefore, is based on an express, unsecured commercial contract, which is one upon which attachment may issue.  Id. § 483.010(a).  Additionally, the total amount of the claim is a fixed or readily ascertainable amount not less than five hundred dollars.  Id.  "[I]t is not necessary that the amount owed appear on the face of the contract; it often happens that the amount due under a contract does not appear on the contract itself."  CIT Group/Equipment Fin. Inc. v. Super DVD, Inc., 115 Cal. App. 4th 537, 540 (Cal. App. 1 Dist. 2004).  Attachment is appropriate "where the damages are readily ascertainable by reference to the contract and basis of the computation of damages

appears to be reasonable and definite." Id.  Here, Verizon Wireless seeks only to attach the deposit due under the Agreement -- approximately $3.3 million.  The amount can be ascertained by reference to the Agreement, and the computation of that amount is reasonable, definite, and greater than zero, i.e., $200 per iPhone that Toro Ride ordered in January 2015.  (See Flowers Decl. Ex. C at 24).

To be subject to attachment under the third prong of Civil Procedure Code section 485.220(a), it must be shown that the attachment is not sought for a purpose other than the recovery upon the claim upon which the attachment is based.  For the same reasons discussed above, Verizon Wireless has demonstrated that the attachment is not sought for a purpose other than the recovery upon the claim upon which the attachment is based.

### 2.       Probable Validity of the Claim

Under the second prong of California Civil Procedure Code section 485.220(a), a claim has "probable validity" if it is more likely than not the plaintiff will obtain a judgment.  Cal. Civ. Proc. Code § 481.190.  The statutory requirements are to be construed strictly.  See Nakasone v. Randall, 129 Cal. App. 3d 757, 761 (Cal. App. 2 Dist. 1982).

Here, the Court finds that the probable validity of plaintiff's claims has been established. Verizon Wireless has shown that Toro Ride entered into an Agreement that it appears to have breached by reselling the iPhones it acquired from Verizon Wireless to third parties overseas where it does not have business operations.  Moreover, under the Agreement, Toro Ride agrees to pay a deposit on the iPhones, which Verizon Wireless requested but has not received.  (Compl. Ex. A ¶ 13, Ex. B).  Thus, Verizon Wireless has established the probable validity of the claim upon which the attachment is based.  (See also Dkt. No. 16).

### 3.       Property Is Not Exempt from Attachment

Under the California Code of Civil Procedure, "all corporate property for which a method of levy is proved by Article 2 (commencing with Section 488.300 of Chapter 8)" is subject to attachment. Cal. Civ. Proc. Code § 487.010(a).  Toro Ride is a corporate defendant and the Court

finds that Verizon Wireless' description of the property to be attached is sufficient as a matter of law.  See Cal. Civ. Proc. Code § 484.020(e); see also Dkt. No. 12 Attach. Nos. 2, 3, 4, 8.

### 4.    Great or Irreparable Injury If Issuance of the Order Is Delayed

The California Code of Civil Procedure provides that with respect to a right to attach order or writ of attachment, the element that "great or irreparable injury would result to the plaintiff if issuance of the order is delayed until the matter could be heard on notice" is satisfied if, among other things, the plaintiff shows that:

> Under the circumstances of the case, it may be inferred that *there is a danger* that the property sought to be attached would be concealed, substantially impaired in value, or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice.

Cal. Civ. Proc. Code § 485.010(b)(1) (emphasis added); see Doehr, 501 U.S. at 16 (holding prejudgment seizure without notice permissible only upon showing of exigent circumstances).

Here, Verizon Wireless has demonstrated that due to the danger that the funds at issue will be concealed if the attachment order is not issued before the matter can be heard on notice, great or irreparable injury would result.  Verizon Wireless relies on Galstian's criminal background and the nature of the fraud scheme herein, which gives "every reason to believe Galstian plans to sell the iPhones overseas and abscond with the proceeds from those sales," resulting in the loss to Verizon Wireless of millions of dollars that it is owed for those phones.  (Dkt. No. 14 at 11-12, 23-24).  Plaintiff notes that Galstian "is an experienced criminal," who already has pleaded guilty "to a sophisticated bank fraud scheme that involved numerous criminal skills -- stealing identities, fraudulently obtaining tax refunds, writing bad checks, and using 60 bank accounts to prevent the bank from detecting his fraud" -- showing that he "knows very well how to mislead and defraud sophisticated entities, and to conceal assets." (Id. at 12 (citation omitted)).  Verizon Wireless also notes that Galstian's pending criminal case "did not deter him from defrauding Verizon Wireless -- even while he was on pretrial supervision" in that case.  (Id.).  Moreover, Galstian has refused to pay the requested deposit, refused to return the iPhones still in Toro Ride's possession, failed to provide Verizon Wireless with Toro Rides' current and future business plans, and falsely claimed

8

that he was not reselling the thousands of iPhones he had acquired but was purchasing them for his business.  (Id.).  Verizon Wireless points out that because it no longer allows Toro Ride to acquire iPhones, Toro Ride "presumably has no means by which to pay" the invoiced monthly fees and charges, which in February 2015 exceeded $4 million.  (Id. at 13; Flowers Decl. Ex. D).  The very nature of Galstian's previous criminal conviction for which sentencing occurs in less than a month, and the similar nature of the allegations herein, lend credibility to Verizon Wireless' claim that there is a danger of Toro Ride concealing the funds in its accounts if given notice and, therefore, Verizon Wireless will suffer great or irreparable injury if the order is not issued before the matter can be heard on notice.  Based on plaintiff's declarations and also on the apparent unwillingness of Toro Ride to abide by the terms of the Agreement and to provide Verizon Wireless with information that would demonstrate Toro Ride's legitimate business plan, the Court finds that Verizon Wireless has carried its burden to show that there is a danger that Toro Ride will conceal the funds and, therefore, that great harm or irreparable injury would result if the order is delayed until the matter can be heard on notice.  (See also Dkt. No. 16).

## B.    TEMPORARY PROTECTIVE ORDER

Verizon Wireless requests a temporary protective order ("TPO") if the Court "determines that the requirements of Section 485.220 are satisfied but that the issuance of the [TPO] instead of the right to attach order and writ would be in the interest of justice and equity to the parties." (Dkt. No. 12 at 22); see also Cal. Civ. Proc. Code § 486.030(a).

Under California law, in conjunction with applying for a writ of attachment, a litigant may apply, as plaintiff did here, for a TPO.  Cal. Civ. Proc. Code § 486.010(a).  The application for TPO "shall state what relief is requested and shall be supported by an affidavit, which may be based on information and belief, showing that the plaintiff would suffer great or irreparable injury . . . if the temporary protective order were not issued."  Cal. Cal. Civ. Proc. Code § 486.010(b).  The Ninth Circuit has summarized this procedure as follows:

> California law allows a creditor to obtain a TPO against a debtor's property
> after it has shown in an ex-parte proceeding the probable validity of its claim and the

probability of great harm if relief is not granted.  The TPO creates a lien on all of the debtor's named property which survives most transfers.

      The creditor can then obtain an order to attach and a writ of attachment after notice and a full hearing. At the hearing, the creditor must show that, on the facts presented, it would be entitled to judgment on the claim on which the attachment is based.

In re Wind Power Sys., Inc., 841 F.2d 288, 291 (9th Cir. 1988) (citations omitted).  Before a TPO will issue, "the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action," Cal. Code Civ. Proc. § 489.210, but the amount of the undertaking is generally $10,000.00.  See id. § 489.220; see also Vershbow v. Reiner, 231 Cal. App. 3d 879, 882-83 (Cal App. 2 Dist. 1991).  A TPO will last either 40 days, a period of less than 40 if ordered by the Court, or when a levy of attachment upon the specified property is made by the plaintiff.  Cal. Code Civ. Proc. § 486.090.

      As discussed above, the Court finds that the requirements of Civil Procedure Code section 485.220 are satisfied.  However, the Court also determines that the issuance of the TPO instead of the attachment order and writ would be in the interest of justice and equity to the parties.  Before the TPO may issue, Verizon Wireless must file an undertaking for $10,000.00.  Once Verizon Wireless posts the undertaking and the Court signs the applicable order, the TPO will go into effect.  Further, a noticed hearing will then be set on Verizon Wireless' application for a right to attach order and writ of attachment.

### III.

### ORDER

Accordingly, IT IS ORDERED that:

(1)  Plaintiff's ex parte application for a temporary protective order is **CONDITIONALLY GRANTED**;

(2)  **Within fourteen days of the date of this Order**, plaintiff must file an undertaking in the amount of $10,000.00;

(3)  The temporary protective order shall go into effect upon plaintiff's notification to this Court of the filing of the required $10,000.00 undertaking, and the issuance by the Court of the temporary protective order;

(4)  Should plaintiff fail to file the undertaking within fourteen days of this Order, then no temporary protective order or attachment will issue and plaintiff's application for writ of attachment will be deemed denied in full; and

(5)  Upon the filing of the undertaking and the issuance of the temporary protective order, the Court will set a briefing schedule and date for the hearing on plaintiff's motion for writ of attachment.

DATED: February 23, 2015

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE